**14 CV 1378**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

| | | |
|---|---|---|
| ERIC FIELD, a/k/a ERIC GLISSON, | : | **COMPLAINT** |
| Plaintiff | : | |
| - against - | : | Civil Action No. |
| THE CITY OF NEW YORK, | : | |
| MICHAEL DONNELLY, THOMAS | | |
| AIELLO, ANNABELLE NIEVES, | : | **JURY TRIAL** |
| SEAN O'TOOLE, Individually and as | | **DEMANDED** |
| Members of the New York City Police | : | |
| Department (NYPD), and | | |
| John Does #1 – 10, | : | |
| Defendant(s) | : | |

----------------------------------------------------------X

RECEIVED
FEB 28 2014
U.S.D.C. S.D.N.Y.

Plaintiff Eric Field, also known as Eric Glisson, by and through his attorneys, Peter A.

Cross and Eaton & Van Winkle, LLP, complaining of the defendants, states as follows:

### INTRODUCTION

1.     Plaintiff Eric Field/Eric Glisson, hereinafter referred to as "Glisson," was wrongly

convicted in 1997 of felony murder in connection with the shooting death of Baithe Diop, a

livery cab driver.  He was sentenced to an indeterminate term of imprisonment of 25 years to life

and spent almost 18 years in jail for a murder he did not commit and was not connected to in any

way.

2.     Glisson's conviction was not the result of innocent or even negligent mistakes and

was not accidental but the direct result of the conduct of a group of New York City Police

Department officers and Detectives, named and as yet unnamed, assigned to the Bronx Homicide Unit who fabricated evidence and false witness testimony.

3.     Glisson was conditionally released from imprisonment on October 24, 2012 and his conviction was vacated and the indictment dismissed on December 13, 2012 after it was revealed by the United States Attorney's Office for the Southern District of New York that two of its cooperating witnesses admitted to acting alone in committing the murder of the livery cab driver and had pled guilty to federal offenses in connection with the shooting death of the livery cab driver.

## JURISDICTION

4.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under 42 U.S.C. § 1983.

5.     Supplemental jurisdiction over Glisson's state law claims exists pursuant to 28 U.S.C. § 1367 (a).

6.     Glisson has complied with the requirements of New York General Municipal Law Section 50-I by serving a notice of claim on City of New York Office of the Comptroller on January 18, 2013, within the time required by New York General Municipal Law Section 50-e. More than 30 days have elapsed since the service of that notice and no offer of settlement has been made.

7.     At the request of the City of New York Office of the Comptroller on March 21, 2013, Glisson submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

## VENUE

8.      Pursuant to 28 U.S.C. § 1391 (b) venue is proper in the Southern District of New

York, the judicial district in which the claims arose.

## JURY DEMAND

9.      Pursuant to the Seventh Amendment of the United States Constitution, the

plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

10.      PLAINTIFF ERIC FIELD a/k/a ERIC GLISSON was at all times material to this

complaint a citizen and resident of the State of New York.  He is currently a citizen of the State

of New York residing in New York, New York.

11.      DEFENDANT CITY OF NEW YORK is a political subdivision of the State of

New York existing by virtue of the laws of the State of New York.

12.      The DEFENDANT MICHAEL DONNELLY [hereinafter, "Defendant

Donnelly"], Tax I.D. No. 8803801, at all times relevant to this complaint was a duly appointed

and acting police officer of the New York City Police Department, an agency of the Defendant

City of New York, with the rank of detective acting under color of law and in his individual

capacity within the scope of employment pursuant to the statutes, ordinances, regulations,

policies, customs and usage of the City of New York and the State of New York.

13.      The DEFENDANT THOMAS AIELLO [hereinafter "Defendant Aiello"], Tax

I.D. No. 868427, at all times relevant to this complaint was a duly appointed and acting police

officer of the New York City Police Department, an agency of the Defendant City of New York, with the rank of detective acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

14.    The DEFENDANT ANNABELLE NIEVES [hereinafter, "Defendant Nieves"], Tax I.D. No. 876782, at all times relevant to this complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the Defendant City of New York, with the rank of detective acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

15.    The DEFENDANT SEAN O'TOOLE [hereinafter, "Defendant O'Toole"], Tax I.D. No. (to be determined), at all times relevant to this complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the Defendant City of New York, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

16.    DEFENDANTS JOHN DOE OFFICERS AND DETECTIVES #1 – 10, whose actual names the plaintiff has been unable to ascertain despite reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe," represent those officers and detective in the New York City Police Department acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances,

4

regulations, policies, customs and usage of the City of New York and the State of New York, who participated in the investigation that led to Glisson's wrongful conviction.

## NATURE OF THE ACTION

17.    This action arises under the Constitution and laws of the United States, particularly 42 U.S.C. §§ 1983, 1985 and 1988 and <u>Brady</u> v. Maryland 373 U.S. 83 (1963) ("Brady") and the laws of the State of New York for the malicious prosecution of Eric Glisson for the murder of Baithe Diop on January 19, 1995. As alleged herein despite the use of fabricated, perjured testimony and false statements to obtain the arrest, indictment, prosecution, conviction and incarceration of the plaintiff for a period of almost 18 years, it was ultimately established that the murder was in fact committed by two known members of the notorious Sex Money Murder ("SMM") gang, Jose Rodriguez ("Rodriguez") and Gilbert Vega ("Vega"), whose identities were known to the defendants shortly following the murder as a result of the NYPD's review of the records of Mr. Diop's cell phone which revealed calls to known associates of Rodriguez and Vega following the murder. As a result of the misconduct of the defendants, plaintiff and four other innocent citizens spent a total of about 98 years in prison and Rodriguez and Vega remained free to commit at least four additional murders and numerous other crimes.

## THE FACTS

18.    On January 19, 1995 shortly before 4:00 a.m. Mr. Baithe Diop ("Mr. Diop"), a livery cab driver, was shot twice and robbed by two male passengers, Jose Rodriguez and Gilbert Vega, as he was driving them from Manhattan to Rosedale and Randall in the Bronx where Rodriguez lived.

19.     As the livery cab was proceeding down Croes Avenue, Rodriguez and Vega had the driver stop and they announced their robbery.  At this point the car was stopped in front of 750 Croes Avenue and across the street from the schoolyard and handball courts of P.S. 107.  An argument with the driver ensued and in the course of the argument Rodriguez and Vega each shot the driver once from the back seat of the car.  The ballistics and medical examiner evidence confirms the location of the entry wounds and the use of two weapons.

20.     After the shooting Vega took the driver's cell phone and both men jumped out of the car and ran across the street and down Croes Place.

21.     The livery cab with Mr. Diop dead or dying inside was still in drive and continued slowly down Croes Avenue, side-swiping several cars along the way until it came to a stop after hitting a dumpster and a tree several hundred feet further down Croes Avenue.

22.     Two residents of 750 Croes Avenue were eyewitness to the robbery and shooting of Mr. Diop and both gave statements to the police at the time of the shooting.  One witness, Juan Molina, had called 911 when he heard the shooting from his apartment and looking out his window saw one of the men running from the scene.  The other eyewitness, Johnetta Lyons, also heard the shooting and she reported seeing two men running from the scene.  Neither of these eyewitnesses reported seeing any other individuals present at the crime scene.

23.     After the robbery and shooting Vega and Rodriguez used Mr. Diop's cell phone to make additional calls before discarding it.  The call records for Mr. Diop's cell phone were obtained by the police and revealed several calls to known associates and relatives of Vega and Rodriguez.  Vega and Rodriguez were known members of the SMM gang which operated in that part of the Bronx.

6

24.     Defendant Michael Donnelly of the 43rd Precinct was assigned as the lead detective on the Diop murder investigation. Despite the fact that the two eyewitnesses at the scene of the shooting in front of 750 Croes Avenue saw no more than two men running from the scene and the fact that Mr. Diop's cell phone records revealed calls to family members and known associates of Vega and Rodriguez, and the fact that the two men were known members of SMM, Detective Donnelly and the NYPD failed to pursue those leads.

25.     In late January 1995 a woman in the neighborhood, Miriam Taveras ("Taveras"), was homeless and was temporarily living with the Gomez family who resided in public housing at 811 Noble Avenue in the same Bronx neighborhood. It was well known in the neighborhood that Taveras was a frequent user of illegal drugs including marijuana and crack-cocaine. At that time Taveras and her 12 year-old son, Jonathan, were staying with Mr. and Mrs. Gomez and their 6 young children in the Gomez apartment because an old man with whom they had been living demanded that Taveras leave and threw them out of his apartment. One day, not long after the Diop murder Mrs. Gomez called the police because of a fight that had occurred between Jonathan Taveras and one of the young Gomez boys.

26.     It was shortly after this incident when she realized she would have to leave the Gomez apartment that Taveras began to cooperate with the police who were investigating the murder of Baithe Diop. Taveras confided to 14 year-old Hanley Gomez, Jr. and his 16 year-old sister, Cathy Gomez, that she was going to offer to provide testimony to the police in exchange for their assistance in getting her housing for herself and her son, Jonathan. Taveras spoke almost no English at the time and so she asked Cathy Gomez and Hanley Gomez, Jr. to go with her to the 43rd Precinct so she could talk to the police about the cab driver's murder and get some

assistance for herself and her son. This first meeting with police at the 43rd Precinct house took place at the end of January and the meetings continued through mid-February, 1995.

27.     The NYPD officers at the meetings with Taveras, Hanley Gomez, Jr. and Cathy Gomez were led by Detective Michael Donnelly and participated in by Detectives Annabelle Nieves and Thomas Aiello. Over the course of multiple meetings, some of which lasted for hours at a time, Detective Michael Donnelly, with assistance from Detectives Aiello and Nieves, provided Taveras, Cathy Gomez and Hanley Gomez, Jr. with information relating to the murder of Baithe Diop on January 19, 1995 as well as the murder of Denise Raymond on January 17, 1995 for the purpose of having each of them provide false statements and evidence implicating five young men from the neighborhood and a stranger, Cathy Watkins, in the Diop and Raymond murders which Donnelly and Aiello theorized were part of murder conspiracy conceived and controlled by Charles McKinnon ("McKinnon") and tied to illegal drug dealings. McKinnon was also indicted and tried for the murders, but he was acquitted.

28.     Although Miriam Taveras was a willing participant in providing this false testimony for use by Detectives Donnelly and Aiello in making their cases for the Diop and Raymond murders, Cathy Gomez and Hanley Gomez, Jr. who were just 16 and 14 years-old, respectively, at the time, were intimidated, threatened and coerced into making false statements and giving false testimony.

29.     The threats to Cathy Gomez made by Detectives Donnelly and Aiello included threats to jail Hanley Gomez, Jr., who at the time was charged with a robbery, as well as threats to implicate him in the Diop and Raymond murders. There were also threats relating to her

parents who at that time were out of prison on parole and probation. These same threats were used against Hanley Gomez, Jr.

30.     At the time of the above-described incidents at the 43rd Precinct, Cathy Gomez and Hanley Gomez, Jr. had been in the United States for only about three years, having moved to New York from the Dominican Republic. They could not speak English very well, nor could they read or write English. Nevertheless, they were coerced into signing written statements for Detectives Donnelly, Aiello and Nieves that were written in English by the detectives. They were not provided with translations and they did not know the contents of the written statements they were made to sign.

31.     The coerced, false written statements given by Cathy Gomez and Hanley Gomez, the false statements given by Miriam Taveras, the false testimony provided to the Grand Jury investigating the Diop and Raymond murders were all used to obtain the indictment of the plaintiff, Glisson, for the murders of Diop and Raymond. The indictment of Glisson for the Raymond murder was dismissed before trial.

32.     On February 3, 1995, Defendant O'Toole arrested Glisson for the murder of Baithe Diop. On March 6, 1995 Glisson was indicted for the murder of Baithe Diop along with five other individuals, Cathy Watkins, Michael Cosme, Carlos Perez, Devon Ayers and Israel Vasquez. Indictment No. 1086/95, Bronx County. A true copy of the Indictment is attached as Exhibit 1.

33.     During the period from the end of January 1995 through to the indictment of Glisson on March 6, Detectives Donnelly and Aiello and other representatives of the NYPD unknown to plaintiff continued to work with Miriam Taveras to fabricate her testimony against

9

Glisson and the other defendants.  In fact, Taveras appeared before the grand jury at least three times during that period to elaborate her testimony and provide additional details.  Cathy Gomez has stated that Detective Donnelly continued to provide her and Taveras with additional details of the crimes each time he met with them.

34.     Cathy Gomez and Hanley Gomez, Jr. have each said that during the period that they were having meetings with Detective Donnelly and Aiello, Detective Donnelly was giving sums of money, as much as $100.00, to their mother.  They believe he also gave money to Taveras and that the NYPD subsequently arranged for public housing for Taveras and her son. Detectives Donnelly, Aiello and Nieves and the NYPD failed to reveal to plaintiff and his defense counsel that money was given to Taveras and the Gomez family.

35.     The murders of Diop and Raymond resulted in three separate trials.  On or about December 9, 1996 Vasquez, Cosme, Ayers and Perez went to trial charged with both murders. Cathy Gomez and Miriam Taveras testified and provided perjured testimony against the defendants.  Detective Michael Donnelly also testified falsely in support of testimony of Cathy Gomez and Miriam Taveras as well as in support of his and Detective Aiello's contrived conspiracy theory linking both murders.  During the trial Donnelly misled the court about a critical security tape at Denise Raymond's workplace.  Had the truth about the contents of this tape been made known at the trial, it would have destroyed the credibility of the prosecution's claim that the Raymond and Diop murders were linked by a conspiracy set in motion and controlled by McKinnon, who had also been indicted for the murders and who would later stand trial separately.  McKinnon was acquitted of all charges when the prosecution at his trial had to admit that Detective Aiello had lied in failing to reveal that he had possession of the tape and that it showed McKinnon was not present at Denise Raymond's workplace at a critical time.  This

10

revelation destroyed the credibility of one of the chief prosecution witnesses, Kim Alexander, who testified at the trial of Vasquez, Cosme, Ayers and Perez as well as at the McKinnon trial.

36.     In the absence of the disclosure of the contents of the video tape and of Aiello's efforts to conceal it, all four defendants were convicted at trial of the Raymond murder.  All of the defendants, except Vasquez, were convicted of the Diop murder based on the perjured testimony of Miriam Taveras and the false and misleading testimony of Detective Michael Donnelly.

37.     Since at least March of 2004 Hanley Gomez, Jr. has maintained that he was coerced by Michael Donnelly and other NYPD officers into signing two statements at the 43rd Precinct on January 31, 1995.  Hanley Gomez, Jr. has stated that he was unaware of the contents of those statements when he was made to sign them at the age of fourteen at a time when his ability to read English was almost non-existent.  Hanley Gomez, Jr. maintains that when he learned the actual contents of the signed statements he refused repeated efforts by Detective Donnelly and other N.Y.P.D. officers to coerce him into testifying about the matters contained in the statement.

38.     Cathy Gomez has stated that when she eventually learned that Donnelly expected her to testify at the Diop and Raymond murder trials she initially refused and that she had to be coerced into testifying at the trial of Vasquez, Cosme, Ayers and Perez.  Although she eventually did testify her testimony was very weak.  Years later in the decision reversing the conviction of Vasquez for the Raymond murder the Appellate Division found that no reasonable jury could have relied on her testimony in convicting Vasquez.

39.     Following his arrest and indictment Glisson was remanded to Rikers Island prison where he remained incarcerated through his trial in September of 1997.

40.     From the time of Glisson's arrest in February 1995 through to his trial, a period of approximately 31 months, Detectives Donnelly and Aiello and other members of the NYPD did nothing to follow-up on the leads created by Diop's cell phone records because those leads were inconsistent with the false theory of the case which they had created with Taveras' assistance.

41.     Detectives Donnelly, Aiello and Nieves knew where Taveras said she was when she allegedly witnessed the Diop murder.  Intentionally and with malice the Detectives ignored the obvious fact that Miriam Taveras could not have witnessed any part of the shooting of Mr. Diop from her bathroom window or any other window at the apartment at 1691 Lafayette Avenue.  The location of the shooting in front of 750 Croes Avenue and across form the schoolyard of P.S. 107 was not visible from her windows.  The only part of the crime scene that would have been partially visible from her windows was the location where Mr. Diop's car finally came to a stop after hitting several parked cars, a dumpster and a tree along Croes Avenue toward its intersection with Lafayette Avenue.

42.     Taveras' grand jury testimony and her trial testimony against Glisson and Watkins are also contradicted by the forensic evidence of the gunshot wounds suffered by Diop. Both wounds were inflicted by shooters in the back seat of the taxi, just as Vega and Rodriguez have confirmed.  Taveras testified that the shots were fired from the front by Eric Glisson in the passenger seat and Michael Cosme outside the vehicle on the driver's side.

43.     On October 28, 1997 at the conclusion of the joint trial of Glisson and Cathy Watkins, Glisson was convicted on two counts of murder in the Second Degree (N.Y. Penal Law

§125.25[1] and [3]. Glisson was sentenced to an indeterminate term of twenty-five years to life in prison. Following his conviction Glisson remained confined in maximum security prisons within the New York State Correction Department until he was conditionally released on an electronic ankle bracelet and daily reporting to the Bronx County D.A. while the reinvestigation of his case was pending.

44.     During the course of his imprisonment Glisson never gave up trying to establish his innocence. He appealed his conviction to the Appellate Division but his appeal was denied based on the same false evidence used to convict him in the first place. His request to appeal to the N.Y. Court of Appeals was denied. He filed a pro se motion for a new trial which was denied. In or about 2002 Glisson filed a petition for a writ of habeas corpus in federal court which was denied in late 2003.

45.     Despite all the set-backs Glisson never gave up trying to establish his innocence. He knew that his only real hope was to find the real killers of Mr. Diop. Based on the circumstances of the crime, he suspected that the actual killers were gang members. He hoped that he would be able to find evidence that would lead to the real killers. For years he worked through friends, family and his attorney on the outside to follow every possible lead that might reveal the real murderers.

46.     In May 2012 one of Glisson's letters seeking help in establishing his innocence landed on the desk of John O'Malley, an Investigator with the U.S. Attorney's Office for the Southern District of New York. From Glisson's description of the murder of Mr. Diop in his letter Investigator O'Malley recognized Glisson's general description of the crime as matching the robbery and shooting to which Vega and Rodriguez has previously confessed in connection

with cooperation and plea agreements each had signed with the U.S. Attorney's Office pursuant to which they agreed to cooperate in the Office's prosecution of members of the SMM gang of which they were also members.

47.    On August 10, 2013 Glisson, by his attorney, filed a new motion under CPL§440 seeking an Order vacating his judgment of conviction and dismissing the indictment. The motion was supported by the Affidavit of John O'Malley sworn to on the 30th day of July, 2012, as well as other evidence demonstrating the inconsistent, perjured testimony of Taveras that had been obtained by Detectives Donnelly, Aiello and Nieves. A copy of the O'Malley Affidavit is attached hereto and made a part here of as Exhibit 2.

48.    On September 26, 2012, Honorable Efraim Alvarado, A.J.S.C. issued a decision and order in which he directed that a hearing be held on the factual issues raised by the companion motions by Glisson and Cathy Watkins. In ordering the hearing Justice Alvarado stated: "The court has very carefully reviewed the exhibits submitted with the motions. These exhibits are compelling but do not enable the Court to reach the conclusion that the motion can or should be granted without an evidentiary hearing." (underscore added). A copy of Judge Alvarado's decision is attached hereto and made a part hereof as Exhibit 3.

49.    Thereafter, according to their representations to the Court, the Bronx County District Attorney conducted an extensive reinvestigation of the case. That investigation included in-person questioning of Vega and Rodriguez as well as interviews of other individuals.

50.    On October 24, 2012, while its reinvestigation of the case was ongoing, the Bronx County District Attorney consented to an order by the Hon. Denis Boyle, J.S.C., pursuant to which the conviction of Glisson was conditionally vacated and the People were given 90 days to

move to reinstate the conviction in which case a hearing would be held on the pending CPL §440 motion to vacate the conviction and dismiss the indictment.  The Consent Order further provided for the release of Glisson provided that he at all times wear a monitoring bracelet.  The Bronx County District Attorney also required that Glisson call in to the D.A.'s office each day at an appointed time.  A copy of the consent Order is attached hereto and made a part hereof as Exhibit 4.

51.     In early December 2013 the Bronx County District Attorney informed counsel for Glisson that the District Attorney would consent to the CPL §440 motions of Glisson and Cathy Watkins and would sign a consent order under CPL §440.10(1)(g) vacating their judgments of conviction and dismissing the indictment as against them for the murder of Mr. Diop.  The consent order was entered by the Hon. Denis J. Boyle, J.S.C. on December 13, 2012.  A copy of the consent order is attached hereto and made a part hereof as Exhibit 5.

52.     The injury inflicted on Glisson by his wrongful conviction through the use of the perjured testimony of Taveras and the false and misleading testimony of detective Donnelly was exacerbated and prolonged by the fact that when in 2003 Vega and Rodriguez first confessed to federal prosecutors their shooting of a cab driver on Croes Avenue in the Bronx in late 1994 or early 1995 Investigator O'Malley contacted the NYPD at the 43rd Precinct which covered Croes Avenue for assistance in determining the identity of the victim and to ascertain if anyone had been imprisoned for that crime (O'Malley Aff. Para 5).  Despite the fact (1) that five people were in fact in prison for the murder of Mr. Diop on Croes Avenue on January 19, 1995; (2) that the Diop murder was linked by the NYPD to the heinous execution-style murder of Denise Raymond in the same area of the Bronx; (3) that members of the NYPD 43rd Precinct and Bronx Homicide had participated in three major homicide investigations and trials based on these crimes, the

15

NYPD was unable to link the information provided by federal authorities to the murder of Mr. Diop. Upon information and belief, the murder of Mr. Diop was the only cab driver shooting that occurred on Croes Avenue in the Bronx during the relevant time period. As a result of this unexplained and inexcusable failure Glisson and four other innocent individuals remained in prison for another nine to ten years.

## COUNT ONE

42 U.S.C. § 1983 4th and 14th Amendment Claims
for Malicious Prosecution

53.     Plaintiff hereby incorporates paragraphs 1 through 52 as if fully set forth herein at length.

54.     Defendants, despite knowing that probable cause did not exist to arrest and prosecute Glisson for the robbery and murder of Baithe Diop, acted with malice individually and in concert to cause Glisson to be arrested, charged and prosecuted for that crime, thereby violating Glisson's rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

55.     Specifically, defendants intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Glisson, including but not limited to the fact that Miriam Taveras' statements implicating Glisson, witness statements purportedly connecting Glisson to the crime and other evidence against Glisson were the product of their own fabrication and/or coercion. The defendants performed the above-described acts deliberately, with reckless disregard or indifference for the truth and with malice.

56.     In fact, Glisson, as he has stated at all times both preceding and after his arrest and maintained throughout his wrongful incarceration, is innocent of the robbery and murder of Baithe Diop.

57.     On December 13, 2012, the prosecution terminated in Glisson's favor when the Bronx County District Attorney dismissed the charges against him.

58.     Glisson's cause of action for malicious prosecution was unavailable to him until December 13, 2012, upon the favorable termination of the criminal proceedings against him. Furthermore, the claim is tolled as defendants concealed from Glisson – and still are concealing to this day – the facts vitiating probable cause to arrest and prosecute him.

59.     But for defendants' unlawful and malicious conduct Glisson would not have been arrested and/or prosecuted and /or convicted for the robbery and murder of Baithe Diop.

60.     Defendants' actions depriving Glisson of his liberty without probable cause were in violation of clearly established constitutional law and no reasonable police officer in 1995 would have believed that the defendants' actions were lawful.

61.     As a direct and proximate result of the defendants' actions, Glisson was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT TWO

42 U.S.C. § 1983 14th Amendment Claims for Deprivation of
Liberty Without Due Process of Law and Denial of a
Fair Trial by Fabricating Evidence and Coercion

62.     Plaintiff hereby incorporates paragraphs 1 through 61 as if fully set forth herein at
length and further alleges as follows.

63.     Defendants, acting individually and in concert, coerced witnesses and fabricated
evidence depriving Glisson of his clearly established constitutional right pursuant to the
Fourteenth Amendment to a fair trial and due process of law.

64.     Specifically, defendants deliberately, with reckless disregard for the constitutional
rights of Glisson, fed facts to and manipulated, bribed, rewarded, coerced and threatened Miriam
Taveras, Cathy Gomez and other witnesses to obtain fabricated statements from them, in a
manner that shocks the conscience, to procure those statements, and by falsely representing in
police reports, in pretrial conversations with prosecutors, and during Glisson's trial that the facts
recounted by those witnesses originated with the witnesses when in fact they had been fed to the
witnesses or otherwise fabricated by the defendant police officers.

65.     Furthermore, the defendants, deliberately and with reckless disregard or
indifference for the constitutional rights of Glisson, failed to disclose to prosecutors their
coercion and fabrications and attempted coercion and fabrications, including but not limited to
witness statements and investigative misconduct on the part of the defendants and others.  Had
this evidence been documented and/or disclosed it would have tended to prove Glisson's
innocence, cast doubt on the entire police investigation of the Diop robbery and murder,
impeached the trial testimony of critical witnesses, and undermined confidence in the verdict

18

against Glisson.  But for defendants' actions, Glisson would not have been indicted for or convicted of the robbery and murder of Mr. Diop.

66.     Glisson's causes of action for denial of his liberty without due process of law and for denial of his right to a fair trial were unavailable to him until December 13, 2012 upon the favorable termination of the criminal proceedings against him. Furthermore, these claims are tolled as defendants concealed from Glisson – and still are concealing to this day – the coercion of witnesses, fabrication of evidence, deliberate failure to investigate and other facts giving rise to these claims.

67.     Defendants' conduct violated Glisson's clearly established constitutional right to a fair trial and not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1995 would have believed that the actions taken by the defendants in feeding facts to witnesses and manipulating, bribing, rewarding, coercing and threatening witnesses in order to fabricate evidence were lawful.  As a direct and proximate result of defendants' actions, Glisson was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT THREE

### 42 U.S.C. § 1983 Claim for Failure to Intercede

68.     Plaintiff hereby incorporates paragraphs 1 through 67 as if fully set forth herein at length and further alleges as follows.

69.     By their conduct and under color of state law, defendants had opportunities to intercede on behalf of Glisson to prevent his malicious prosecution, lack of a fair trial, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

70.     Defendants' failures to intercede violated Glisson's clearly established constitutional rights to not be maliciously prosecuted, denied a fair trial and deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 1995 would have believed that failing to intercede to prevent defendants from feeding facts to, manipulating, bribing, rewarding, coercing and threatening alleged witnesses to fabricate evidence and cause Glisson to be arrested and prosecuted without probable cause were lawful.  As a direct and proximate result of the defendants' failures to intercede, Glisson was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT FOUR

42 U.S.C. § 1983 4th and 14th Civil Rights Conspiracy Claim

71.     Plaintiff hereby incorporates paragraphs 1 through 70 as if fully set forth herein at length and further alleges as follows.

72.     Defendants Donnelly, Aiello, Nieves and John Does #1-10, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals not within the employ of the New York Police Department or New York City to act in concert in order to deprive Glisson of his clearly established Fourth and Fourteenth

Amendment rights to be free from malicious prosecution, deprivations of liberty without due process of law, and a fair trial.

73.     In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

A.  Defendants Donnelly, Aiello, Nieves and others procured, through coercion, intimidation, and feeding of facts, Taveras' statement implicating Glisson in the Diop robbery and murder, despite the fact that they knew or should have known that Glisson had no involvement in the crime.

B.  Defendants Donnelly, Aiello and Nieves and others withheld Brady material from the prosecutors and from Glisson.  Such materials included the following:

1.  Failure to disclose that Taveras, Cathy Gomez and Hanley Gomez had been fed facts about the Diop murder of which they had not personal knowledge.

2.  Failure to disclose money and other things of value provided to Taveras and the family of Cathy Gomez and Hanley Gomez, Jr.

3.  Failure to reveal the information obtained about the calls made to family and associates of Vega and Rodriguez.

4.  Failure to properly record and secure evidence such as paint chips, bullets and the victim's clothing, all of which would have undermined the prosecution's theory of the case.

5.  Failure to reveal the contents of the security tapes at Ms. Raymond's place of employment which would have undermined the prosecution theory that the

Diop and Raymond murders were part of a conspiracy among plaintiff and the other individuals who were tried and convicted of one or both murders.

C. Defendants deliberately fabricated reports, both written and oral, and other accounts of their investigative activities.

D. Defendants John Does #1-10 authorized the decision to arrest Glisson, notwithstanding that they knew or should have known that defendants Aiello, Donnelly, Nieves and others had conducted their investigation in a manner that violated the constitutional rights of Glisson.

E. Defendants Donnelly, Aiello, Nieves and John Does #1-10 had an opportunity to disclose and report the ongoing conspiracy and the opportunity to otherwise prevent the overt acts committed in furtherance of the conspiracy, but failed to do so, despite knowing that the acts were unlawful and would result in the wrongful prosecution, conviction and imprisonment of Glisson.

74.    As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Glisson was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT FIVE

42 U.S.C. § 1983, 4 and 14th Civil Rights Conspiracy and Failure to Intercede;
as well as violation of plaintiff's right to substantive due process under the
Constitution and laws of the State of New York

75.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 74 of this complaint.

76.     Beginning at least as early as 1997 the City, the NYPD, the U.S. Attorney's Office for the Southern District of New York and other agencies of the United Sates Government were engaged in joint activities targeting SMM which operated primarily in Bronx County, New York.  This cooperative effort was generally known as a Joint Task Force ("JTF").

77.     Upon information and belief, from the inception of the JTF in about 1997 the City and the NYPD acquired knowledge about the participation of members of SMM in crimes involving illegal drugs, robberies and murders.

78.     Upon information and belief, among the information shared among members of the JTF, including defendants the City and the NYPD, was the participation by SMM members Gilbert Vega and Jose Rodriguez in violent crimes, including shooting and murders.  Upon information and belief, that shared information included information about the robbery and murder of Baithe Diop on January 19, 1995 on Croes Avenue in the Bronx.

79.     Upon information and belief, in March 2003, as part of the prosecution of various members of SMM by the U.S. Attorney for the Southern District of New York, that office received a proffer from Gilbert Vega ("Vega") who had by that time become a cooperating defendant with the prosecution.  In the course of disclosing information about his own prior criminal acts Vega disclosed that in late 1994 or early 1995 he and Jose Rodriguez ("Rodriguez") had participated in the robbery and shooting of a black livery cab driver they believed to be African on Croes Avenue across the street from P.S. 107 in the Bronx.  The federal prosecutors then confirmed Vega's account with Rodriguez who was also in federal custody at the time and was also cooperating with the prosecution.

80.     Investigator O'Malley was one of the federal agents working on the SMM prosecutions in the Southern District of New York in 2003 and he personally participated in the separate proffers by Vega and Rodriguez in which they disclosed how they shot and robbed the livery cab driver on Croes Avenue in the Bronx.

81.     Following these disclosures by Vega and Rodriguez, Investigator O'Malley, according to this sworn statement in the O'Malley Affidavit at para. 5 did as follows:

> I, along with an ATF Special Agent assigned to the case, and with
> assistance from several Bronx Homicide detectives, did everything
> to try to identify the victim of the robbery and shooting and to
> ascertain whether the victim had died (as both Vega and Rodriguez
> believed they had killed the driver, although they did not stay in
> the car to verify the fact).  My efforts included speaking multiple
> times to the detective squad at the 43rd Precinct to ask for their help
> locating pertinent homicide files or police reports; the ATF Special
> Agent and the primary Bronx Homicide detective assisting us also
> made inquiries there as well….That search did not produce any
> matching results, and at no time did anyone at the 43rd Precinct or
> Bronx Homicide tell me or the ATF Special Agent about the
> homicide case of Baithe Diop….

82.     Upon information and belief, during this same time period from 2002 to late 2003 Glisson had a pending Habeas Corpus petition pending in the U.S. District Court for the Southern District of New York.

24

83.     Upon information and belief from 2000 until his retirement from the NYPD in 2004 Defendant Michael Donnelly was a detective in the Bronx Homicide Bureau, the same bureau of the NYPD that Investigator O'Malley stated that he contacted in 2003 to obtain information about the livery cab driver murder on Croes Avenue in the Bronx that Vega and Rodriguez had confessed to committing.

84.     Upon information and belief, defendant Annabelle Nieves was an NYPD detective assigned to Bronx Homicide in 2003, the same bureau of the NYPD that Investigator O'Malley stated that he contacted in 2003.

85.     Upon information and belief, defendant Sean O'Toole, who was the NYPD police sergeant who arrested plaintiff Eric Glisson on February 3, 1995 for the murder of Baithe Diop, was assigned to the Bronx Homicide Bureau in 2003 when Investigator O'Malley contacted the Bureau for assistance in identifying the livery cab driver who was shot and robbed on Croes Avenue across the street from P.S. 107 in late 1994 or early 1995.

86.     Despite the presence of defendants Donnelly, Nieves and O'Toole in the Bronx Homicide Bureau in 2003 when Investigator O'Malley contacted that office and requested their assistance in identifying the victim of the livery cab driver shooting on Croes Avenue in late 1994 or early 1995, according to the sworn affidavit of Investigator O'Malley at no time did anyone at Bronx Homicide tell him about the homicide case of Baithe Diop that occurred at that location.

87.     Investigator O'Malley also contacted the 43rd Precinct of the NYPD to seek their assistance in identifying the victim of the livery cab driver shooting on Croes Avenue just about 300 yards as the crow flies from the Precinct House.  Despite the fact that the Diop homicide

combined with the Raymond homicide was a major case for the 43rd Precinct involving more than two dozen officers in various parts of the investigation and despite the fact that the cases resulted in three separate homicide trials that lasted into 1998 and resulted in the conviction of five individuals for the murders, no one in the 43rd Precinct identified the Diop case for the federal investigator.

88.     The failure of the NYPD through its officers and employees at the Bronx Homicide Bureau and the 43rd Precinct to inform the federal investigator of the Diop homicide case led to the unlawful and unwarranted continued incarceration of the plaintiff and four other innocent individuals in maximum security prison for at least nine additional years.

89.     The NYPD had a continuing duty to plaintiff and to the other convicted defendants to disclose to the federal investigator the existence of the Diop homicide and to the plaintiff and the other defendants the fact that Vega and Rodriguez had confessed to the murder for which they were serving life prison terms.

90.     The failure of officers and employees of the NYPD and defendants Donnelly, Nieves and O'Toole to identify the Baithe Diop homicide to the federal investigator and the subsequent continued incarceration of Glisson in maximum security prison violated Glisson's constitutional right to substantive due process under the constitutions of the United States and New York and extended his wrongful imprisonment under color of law.

91.     As a result of the conduct of the NYPD and the named defendants acting in their official capacities, the plaintiff's wrongful imprisonment was extended for an additional term of at least nine years.

92.     The actions of the NYPD and defendants Donnelly, Nieves and O'Toole deprived plaintiff of his civil rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution 42 U.S. C. § 1983and the Constitution and laws of New York.

## COUNT SIX

State Law Malicious Prosecution Claim

93.     Plaintiff hereby incorporates paragraphs 1 through 92 as if fully set forth herein at length and further alleges as follows.

94.     The defendants, despite knowing that probable cause did not exist to arrest, charge and prosecute Glisson for the robbery and murder of Mr. Diop, intentionally, recklessly and with malice caused Glisson to be arrested, charged, prosecuted and convicted for Diop's robbery and murder.

95.     The defendants intentionally withheld from, and misrepresented to, prosecutors and the grand jury material exculpatory facts that further vitiated probable cause against Glisson including but not limited to the fact that the evidence implicating Glisson was the product of fabrication, the feeding of information to Taveras and Cathy Gomez, and coercion, threats and manipulation of the alleged witnesses.

96.     The defendants, Donnelly, Aiello, Nieves and O'Toole and other police and employees of the City or any of its agencies named here in as defendants John Does 1-10 and Jane Does 1-10 were aware of the false and inaccurate information, statements and testimony obtained by them from Miriam Taveras, Cathy Gomez and Hanley Gomez, Jr.  Nevertheless,

they deliberately, unjustifiably, in bad faith and for the purpose of obtaining the arrest and prosecution of plaintiff Glisson and others for the murders of Baithe Diop and Denise Raymond, withheld from the Bronx District Attorney's Office, and therefore from the Grand Jury, the aforementioned material evidence favorable to plaintiff which they knew or should have known negated probable cause for the arrest, indictment and prosecution of plaintiff for the murder of Baithe Diop.

97.    The defendants, Donnelly, Aiello, Nieves and O'Toole and other police and employees of the City or any of its agencies named herein as defendants John Does 1-10 and Jane Does 1-10 had a duty to disclose such evidence to the D.A.'s office in connection with the investigation and prosecution of this case.

98.    By virtue of the foregoing, defendants Donnelly, Aiello, Nieves and O'Toole and John Does 1-10 and Jane Does 1-10 knowingly, intentionally and/or recklessly caused the arrest and prosecution of plaintiff Eric Glisson for the murder of Baithe Diop based upon false, misleading, incomplete and tainted evidence, for which there was no probable or just cause.

99.    Defendants Donnelly, Aiello, Nieves and O'Toole and John Does 1-10 and Jane Does 1-10 intended by their actions to cause the arrest, prosecution and wrongful conviction of plaintiff Eric Glisson for the murder of Baithe Diop.

100.    Defendants Donnelly, Aiello, Nieves and O'Toole and John Does 1-10 and Jane Does 1-10 acted with actual malice in the obtaining and fabrication of false evidence against plaintiff Eric Glisson and in the concealment from plaintiff Glisson and his counsel of evidence such as Mr. Diop's cell phone records which would have led to the timely discovery by plaintiff and his counsel that Jose Rodriguez and Gilbert Vega, two known members of SMM had used

28

that cell phone to call associates and/or family members around the time of Diop's murder. Aiello and Donnelly also concealed from plaintiff and his counsel the contents of the security tape taken from Denise Raymond's place of employment which if disclosed would have destroyed the prosecution's theory of the Diop and Raymond murders being part of a conspiracy conceived and masterminded by McKinnon. The subsequent disclosure of the true contents of the security tape led to the ultimate acquittal of McKinnon on all charges. Had the actual contents of the security tape been revealed to defense counsel for plaintiff and all the other defendants charged in the fabricated murder conspiracy, Cosme, Vasquez, Ayers and Perez would not have been convicted in the first trial and plaintiff probably would not have been prosecuted in a second trial.

101.    Glisson's cause of action for malicious prosecution was unavailable to him until December 13, 2012, upon the favorable termination of the criminal proceedings against him.

102.    The Defendants' conduct directly and proximately caused Glisson's wrongful conviction and nearly eighteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

## COUNT SEVEN

State Law Respondent Superior Claim Against
City of New York for Malicious Prosecution

103.    Plaintiff hereby incorporates paragraphs 1 through 102 as if fully set forth herein at length and further alleges as follows.

104.    At all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, the City of New York. The conduct by which

29

defendants committed the tort of malicious prosecution was undertaken while defendants were on duty, carrying out their routine investigative functions as New York Police Department detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer.

105.    The City of New York is liable for its agents' state law tort of malicious prosecution under the doctrine of respondeat superior.

## COUNT EIGHT

### State Law Claim for Intentional or Reckless
### Infliction of Emotional Distress

106.    Plaintiff hereby incorporates paragraphs 1 through 105 as if fully set forth herein at length and further alleges as follows.

107.    The conduct of defendants in deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution and incarceration of Glisson was extreme and outrageous and directly and proximately caused the grievous and continuing injuries and damages set forth above.

108.    Glisson's cause of action for intentional or reckless infliction of emotional distress by defendants was unavailable to him until December 13, 2012, upon the favorable termination of the criminal proceedings against him. Furthermore, this claim is tolled as defendants concealed from Glisson – and still are concealing to this day – their conduct giving rise to this cause of action.

## COUNT NINE

State Law claim for Negligent Infliction of Emotional Distress

109.     Plaintiff hereby incorporates paragraphs 1 through 108 as if fully set forth herein at length and further alleges as follows.

110.     The defendants negligently and grossly negligently, and in breach of their duties owed to him to refrain from fabricating evidence, coercing witnesses, withholding material exculpatory and impeachment evidence, and otherwise acting to deny him process of law, directly and proximately caused Glisson, who was innocent, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for nearly eighteen years.  Defendants' actions caused Glisson to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

111.     Glisson's cause of action for negligent infliction of emotional distress by defendants was unavailable to him until December 13, 2012, upon the favorable termination of the criminal proceedings against him.  Furthermore, this claim is tolled as the defendants concealed from Glisson – and still are concealing to this day – their conduct giving rise to this cause of action.

WHEREFORE, Glisson prays as follows:

A.     That the Court award compensatory damages to him and against defendants, jointly and severally on each and every claim herein, in an amount to be determined at trial;

31

B.     That the Court award punitive damages to him and against all individual defendants, in

       an amount to be determined at trial, that will deter such conduct by defendants in the

       future;

C.     For a trial by jury;

D.     For pre-judgment and post-judgment interest and recovery of his costs, including

       reasonable attorney's fees pursuant to 42U.S.C. § 1988 for all 42 U.S.C. § 1983 claims;

       and

E.     For any and all other relief to which he may be entitled.

Dated:        New York, New York
              February 28, 2014

                                    EATON & VAN WINKLE

                                    By:    PETER A. CROSS, ESQ.
                                    A Member of the Firm
                                    Attorneys for Plaintiff
                                    Eric Field, a/k/a Eric Glisson
                                    3 Park Avenue
                                    New York, New York   10016
                                    (212) 561-3601 – tel
                                    (212) 779-9928 – fax
                                    pcross@evw.com

# EXHIBIT 1

# INDICTMENT

# SUPREME COURT OF THE STATE OF NEW YORK

# COUNTY OF THE BRONX

PEOPLE OF THE STATE OF NEW YORK
                    AGAINST

(J)  GLISSON, ERIC — AFO/VFO
         DEFENDANT: 95X006607
(J)  COSME, MICHAEL — AFO/VFO
         DEFENDANT: 95X006608
(J)  WATKINS, CATHY — AFO/VFO
         DEFENDANT: 95X009121
(J)  PEREZ, CARLOS AKA KOJAC — AFO/VFO
         DEFENDANT: 95X008073
(J)  VASQUEZ, ISRAEL — AFO/VFO
         DEFENDANT: 95X008074
(J)  MCKINNON, CHARLES EDWARD — AFO/VFO
         DEFENDANT: 95X011360
(X)  AYERS, DEVON AKA SKLOO — AFO/VFO
         DEFENDANT: IBNA

INDICTMENT #: 1086-95

GRAND JURY #: 40926/95

## COUNTS

CONSPIRACY IN THE SECOND DEGREE
MURDER IN THE SECOND DEGREE
    (   3 COUNTS  )
BURGLARY IN THE FIRST DEGREE
ROBBERY IN THE FIRST DEGREE
MURDER IN THE SECOND DEGREE
    (   2 COUNTS  )
ROBBERY IN THE FIRST DEGREE
ROBBERY IN THE SECOND DEGREE
CRIMINAL USE OF A FIREARM IN THE FIRST DEGREE
    (   2 COUNTS  )
CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE
    (   2 COUNTS  )
CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE
    (   2 COUNTS  )
CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE

DATE 7-1-98
I hereby certify that the foregoing
paper is a true copy of the original
thereof, filed in my office

_____
                 rk and Clerk of
              Bronx County
NO FEE FOR OFFICIAL USE

MARCH 6, 1995          MAR 13 1995

A TRUE BILL

_____
        FOREPERSON

ROBERT T. JOHNSON
DISTRICT ATTORNEY

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS OF THE CRIME OF CONSPIRACY IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 17, 1995, IN THE COUNTY OF THE BRONX, WITH INTENT THAT CONDUCT CONSTITUTING A "CLASS A" FELONY BE PERFORMED, DID AGREE WITH ONE OR MORE PERSONS TO ENGAGE IN OR CAUSE THE PERFORMANCE OF SUCH CONDUCT. IN THE FURTHERANCE OF THE CONSPIRACY AND IN ORDER TO EFFECT THE OBJECTS THEREOF, THE FOLLOWING OVERT ACT WAS PERFORMED BY CERTAIN OF THE PARTIES TO THE UNLAWFUL CONSPIRACY: CHARLES McKINNON CONFRONTED DENISE RAYMOND ON JAN. 17, 1995 AT FIVE PENN PLAZA, N.Y. N.Y..

SECOND COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS MICHAEL COSME,CARLOS PEREZ,ISRAEL VASQUEZ,CHARLES EDWARD MCKINNON,AND DEVON AYERS OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, MICHAEL COSME,CARLOS PEREZ,ISRAEL VASQUEZ,CHARLES EDWARD MCKINNON,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 17, 1995, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE THE DEATH OF A PERSON, DID CAUSE THE DEATH OF DENISE RAYMOND BY SHOOTING DENISE RAYMOND TWICE IN HER HEAD.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

## THIRD COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARDMCKINNON, AND DEVON AYERS OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 17, 1995, IN THE COUNTY OF THE BRONX, DID COMMIT OR ATTEMPT TO COMMIT THE CRIME OF BURGLARY AND, IN THE COURSE OF AND IN FURTHERANCE OF SUCH CRIME OR OF IMMEDIATE FLIGHT THEREFROM, THEY CAUSED THE DEATH OF DENISE RAYMOND, WHO WAS NOT A PARTICIPANT IN THE CRIME.

## FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 17, 1995, IN THE COUNTY OF THE BRONX, DID COMMIT OR ATTEMPT TO COMMIT THE CRIME OF ROBBERY AND, IN THE COURSE OF AND IN FURTHERANCE OF SUCH CRIME OR OF IMMEDIATE FLIGHT THEREFROM, THEY CAUSED THE DEATH OF DENISE RAYMOND, WHO WAS NOT A PARTICIPANT IN THE CRIME.

FIFTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS OF THE CRIME OF BURGLARY IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 17, 1995, IN THE COUNTY OF THE BRONX, DID KNOWINGLY ENTER OR REMAIN UNLAWFULLY IN THE DWELLING OF DENISE RAYMOND WITH INTENT TO COMMIT A CRIME THEREIN, AND IN EFFECTING ENTRY OR WHILE IN THE DWELLING OR IN IMMEDIATE FLIGHT THEREFROM, THE DEFENDANTS CAUSED PHYSICAL INJURY TO DENISE RAYMOND, WHO WAS NOT A PARTICIPANT IN THE CRIME.

SIXTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS OF THE CRIME OF ROBBERY IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, MICHAEL COSME, CARLOS PEREZ, ISRAEL VASQUEZ, CHARLES EDWARD MCKINNON, AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 17, 1995, IN THE COUNTY OF THE BRONX, DID FORCIBLY STEAL PROPERTY, THAT BEING JEWELRY AND OTHER ITEMS, FROM DENISE RAYMOND, AND IN THE COURSE OF THE COMMISSION OF THE CRIME OR IN IMMEDIATE FLIGHT THEREFROM, THE DEFENDANTS CAUSED SERIOUS PHYSICAL INJURY TO DENISE RAYMOND, WHO WAS NOT A PARTICIPANT IN THE CRIME.

SEVENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE THE DEATH OF A PERSON, DID CAUSE THE DEATH OF BATHIE DIOP BY SHOOTING BATHIE DIOP TWO TIMES.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

EIGHTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID COMMIT OR ATTEMPT TO COMMIT THE CRIME OF ROBBERY AND, IN THE COURSE OF AND IN FURTHERANCE OF SUCH CRIME OR OF IMMEDIATE FLIGHT THEREFROM, THEY CAUSED THE DEATH OF BATHIE DIOP, WHO WAS NOT A PARTICIPANT IN THE CRIME.

NINTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF ROBBERY IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID FORCIBLY STEAL PROPERTY, THAT BEING A RADIO AND OTHER ITEMS, FROM BATHIE DIOP, AND IN THE COURSE OF THE COMMISSION OF THE CRIME OR IN IMMEDIATE FLIGHT THEREFROM, THE DEFENDANTS WERE ARMED WITH A DEADLY WEAPON, THAT BEING A LOADED HANDGUN.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

TENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF ROBBERY IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, AND EACH AIDING THE OTHERS ACTUALLY PRESENT, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID FORCIBLY STEAL PROPERTY, THAT BEING A RADIO AND OTHER ITEMS, FROM BATHIE DIOP.

ELEVENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL USE OF A FIREARM IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID COMMIT A "CLASS B" VIOLENT FELONY OFFENSE AND POSSESS A DEADLY WEAPON, THAT BEING A LOADED HANDGUN, WHICH WAS A LOADED WEAPON FROM WHICH A SHOT, READILY CAPABLE OF PRODUCING DEATH OR OTHER SERIOUS INJURY, MAY HAVE BEEN DISCHARGED.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

TWELFTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL USE OF A FIREARM IN THE FIRST DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID COMMIT A "CLASS B" VIOLENT FELONY OFFENSE AND POSSESS A DEADLY WEAPON, THAT BEING A LOADED HANDGUN, WHICH WAS A LOADED WEAPON FROM WHICH A SHOT, READILY CAPABLE OF PRODUCING DEATH OR OTHER SERIOUS INJURY, MAY HAVE BEEN DISCHARGED.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

THIRTEENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID POSSESS A LOADED FIREARM, THAT BEING A HANDGUN, WITH INTENT TO USE UNLAWFULLY AGAINST ANOTHER.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

FOURTEENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID POSSESS A LOADED FIREARM, THAT BEING A HANDGUN, WITH INTENT TO USE UNLAWFULLY AGAINST ANOTHER.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

FIFTEENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID POSSESS A LOADED FIREARM, THAT BEING A LOADED HANDGUN, SUCH POSSESSION NOT BEING IN THE DEFENDANTS' HOMES OR PLACES OF BUSINESS.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

SIXTEENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID POSSESS A LOADED FIREARM, THAT BEING A LOADED HANDGUN, SUCH POSSESSION NOT BEING IN THE DEFENDANTS' HOMES OR PLACES OF BUSINESS.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

SEVENTEENTH COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANTS ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS OF THE CRIME OF CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANTS, ERIC GLISSON,MICHAEL COSME,CATHY WATKINS,CARLOS PEREZ,ISRAEL VASQUEZ,AND DEVON AYERS, ACTING IN CONCERT WITH EACH OTHER AND OTHERS, ON OR ABOUT JANUARY 19, 1995, IN THE COUNTY OF THE BRONX, DID KNOWINGLY POSSESS STOLEN PROPERTY, THAT BEING A RADIO AND OTHER ITEMS, OWNED BY BATHIE DIOP, WITH INTENT TO BENEFIT THEMSELVES OR A PERSON OTHER THAN AN OWNER THEREOF OR TO IMPEDE THE RECOVERY BY AN OWNER THEREOF.

ROBERT T. JOHNSON

DISTRICT ATTORNEY

G R A N D   J U R Y   R E P O R T

C O U N T Y :   T H E   B R O N X

INDICTMENTS#          GRAND JURY # 40926/95   FINDING: INDICTED

| DEFENDANTS | CORRESPONDING DOCKETS |
|---|---|
| 1. GLISSON, ERIC | 95X006607 |
| 2. COSME, MICHAEL | 95X006608 |
| 3. WATKINS, CATHY | 95X009121 |
| 4. PEREZ, CARLOS AKA KOJAC | 95X008073 |
| 5. VASQUEZ, ISRAEL | 95X008074 |
| 6. MCKINNON, CHARLES EDWARD | 95X011360 |
| 7. AYERS, DEVON AKA SKLOO | IBNA |

INDICTMENT CHARGES:

CONSPIRACY IN THE SECOND DEGREE
  P.L. 105.15
MURDER IN THE SECOND DEGREE
  P.L. 125.25(1)
MURDER IN THE SECOND DEGREE
  P.L. 125.25(3)          (   2 COUNTS )
BURGLARY IN THE FIRST DEGREE
  P.L. 140.30(2)
ROBBERY IN THE FIRST DEGREE
  P.L. 160.15(1)
MURDER IN THE SECOND DEGREE
  P.L. 125.25(1)
MURDER IN THE SECOND DEGREE
  P.L. 125.25(3)
ROBBERY IN THE FIRST DEGREE
  P.L. 160.15(2)
ROBBERY IN THE SECOND DEGREE
  P.L. 160.10(1)
CRIMINAL USE OF A FIREARM IN THE FIRST DEGREE
  P.L. 265.09(1)          (   2 COUNTS )
CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE
  P.L. 265.03          (   2 COUNTS )
CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE
  P.L. 265.02(4)          (   2 COUNTS )
CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE
  P.L. 165.40


        SCHEDULED ARRAIGNMENT DATE:

        ARRAIGNMENT PART:

        OTHER ASSOCIATED INDICTMENTS:

DATE COMPLETED: MARCH 6, 1995

ADA: DANIEL MCCARTHY

BUREAU: SENIOR STAFF

EXHIBIT 2

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

PEOPLE OF THE STATE OF NEW YORK     :

    :

             -v-                  :

ERIC GLISSON                         :
     and
CATHY WATKINS,                    :

          Defendants.            :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

STATE OF NEW YORK                )
COUNTY OF NEW YORK         ) ss.:

### AFFIDAVIT IN CONNECTION WITH DEFENDANTS' <br> <u>MOTION FOR A NEW TRIAL</u>

        John O'Malley, hereby affirms under penalty of perjury:

        1.        I am an Investigator in the Office of Preet Bharara, United States Attorney

for the Southern District of New York (the "Office"), assigned to the Violent Crimes Unit. I

have been an Investigator in this Office since February 1995. Prior to joining the United States

Attorney's Office ("USAO"), I was a police officer with the New York City Police Department

("NYPD") for 13 years. I was promoted to Detective in 1987, and for the next eight years I

worked as a detective in Bronx Homicide. I retired from the NYPD in 1995. In the course of my

career in law enforcement, with both the NYPD and the USAO, I have participated in the

investigation of hundreds of homicides, as well as other violent crimes. I submit this affidavit in

connection with a motion by defendants Eric Glisson and Cathy Watkins seeking to overturn

their convictions in the homicide of Baithe Diop.  Unless otherwise indicated below, where I relate the statements of other people, I am relating those statements in substance and in part.

2.      In 1997, I was involved in an investigation at the USAO of Peter Rollack, a/k/a "Pistol Pete," and his gang Sex, Money, Murder ("SMM"), which operated in the Soundview section of the Bronx, within the confines of the 43rd Precinct.  Rollack and various confederates were indicted in United States v. Peter Rollack, et. al., 97 Cr. 1293 (MGC), in the United States District Court for the Southern District of New York.  One of the defendants in that indictment was Jose Rodriguez, a/k/a "Joey Green Eyes."  Rodriguez became a cooperating witness in that case and pled guilty to a racketeering conspiracy, including murders of witnesses ordered by Rollack, pursuant to a cooperation agreement with this Office.  I attended many of Rodriguez's proffers during his cooperation in 1997, along with the AUSA primarily responsible for Rodriguez's case ("AUSA-1").

3.      In 2001, I was involved in another investigation and prosecution of members of SMM by this Office, which resulted in the indictment of 14 defendants with racketeering charges stemming from SMM's continuing narcotics operation and associated violence:  United States v. Sean Carr, et al., 01 Cr. 490 (TPG), in the United States District Court for the Southern District of New York.  One of the defendants in the 2001 indictment was Gilbert Vega, a/k/a "GI."  Vega became a cooperating witness in that case and began proffering with this Office in 2002.  I attended many of the Vega proffers, along with the AUSA primarily responsible for Vega's case ("AUSA-2").  The process of cooperation in this Office at that time, and today, requires cooperating witnesses to proffer about all of their own criminal conduct, whether charged or uncharged.  In March of 2003, in a proffer conducted by AUSA-2, Vega stated, in substance,  that in the winter of 1994 or 1995, he and Rodriguez had robbed a livery

2

cab driver and, in the course of the robbery, both he and Rodriguez had shot the driver.  During that proffer and subsequent proffers, Vega stated that he and Rodriguez had been in Harlem in northern Manhattan, visiting a girl that Rodriguez knew.  The visit had not gone well and, in the early morning hours, he and Rodriguez left the girl's apartment and, once on the street, got into a livery cab with an African driver to return to Soundview in the Bronx.  On the way home to the Bronx, Vega and Rodriguez decided to rob the cabdriver, and directed the driver to the block of Croes Avenue between Seward and Lafayette, across the street from P.S. 107 and near the Clason Point Houses and the adjacent handball courts.  Once there, Vega and Rodriguez, who were both armed, pulled out their guns and demanded money from the driver.  An argument and a struggle ensued, and Rodriguez fired his gun and shot the driver; Vega fired his gun and shot the driver as well, almost immediately after Rodriguez fired his weapon.  Vega and Rodriguez both fled from the vehicle, which was still moving slowly up Croes Avenue towards Lafayette Avenue.

4.      Following the proffers by Vega, I visited Rodriguez in federal prison, along with AUSA-1.  We asked Rodriguez, in substance, if he had ever robbed and shot a cabdriver.  Rodriguez reacted very emotionally to our inquiry, and immediately confessed to his involvement in the robbery and shooting described to us by Vega, confirming Vega's account in every substantive detail, including the approximate time frame (Rodriguez placed the time as late in 1994), the exact location of the robbery, the events preceding the robbery, and his and Vega's physical positions and actions inside the livery cab.  The only substantive difference in their accounts was that Vega claimed the initial idea for the robbery was Rodriguez's, and Rodriguez claimed that the initial idea for the robbery was Vega's.  We asked Rodriguez why he had not told us about the robbery previously, during his proffer sessions, and he stated that he did not believe that we would ever learn about this robbery, because no one knew about it except for him

3

and Gilbert Vega, and they had both sworn to each other that they would keep the robbery and shooting a secret, for fear that they would be punished by Rollack for bringing unwanted law enforcement attention to the neighborhood. I am familiar with the circumstances of Rodriguez's incarceration from the time of his arrest in 1997 until the interview described in this paragraph; because of those circumstances, I do not believe it would have been possible for Rodriguez to have communicated with Vega, or any other members of SMM, or the Soundview community in general, during the period beginning shortly after his arrest.

5.     Following the interviews with Vega and Rodriguez described above, I, along with an ATF Special Agent assigned to the case, and with assistance from several Bronx Homicide detectives, did everything to try to identify the victim of the robbery and shooting, and to ascertain whether the victim had died (as both Vega and Rodriguez believed that they had killed the driver, although they did not stay in the car to verify that fact). My efforts included, among other things, speaking multiple times to the detective squad at the 43rd Precinct to ask for their help locating any pertinent homicide files or police reports; the ATF Special Agent and the primary Bronx Homicide detective assisting us also made inquiries there as well. We undertook this search for multiple reasons: (i) to confirm and corroborate the information provided by Vega and Rodriguez; (ii) to meet our obligations to crime victims and their families, once identified; and (iii) to make sure that Vega and Rodriguez, as part of their cooperation, were pleading guilty to the most serious relevant charge, as is required by the cooperation policies and practices in place in this Office. That search did not produce any matching results, and at no time did anyone at the 43rd Precinct or Bronx Homicide tell me or the ATF Special Agent about the homicide case of Baithe Diop. At the time, based on my familiarity with the record-keeping systems of the NYPD in the 1990s, I concluded that perhaps the cabdriver had survived his injuries, and may

4

have managed to drive into an adjacent precinct or to a hospital, or some other similar reason why the file was not coded as a homicide in the 43rd Precinct.

6.      Because we had no proof of death and no identified victim, Vega and Rodriguez could not plead to a homicide.  As part of his cooperation agreement with this Office, on July 22, 2003, Vega pled guilty to discharging a firearm in furtherance of a robbery, in violation of 18 U.S.C. § 924(c), to account for his participation in the robbery and shooting described above, in addition to various other charges (including his participation in another murder that was committed by his confederates in another, unrelated, robbery).  On January 24, 2008, Rodriguez pled guilty to a robbery and to using a firearm in furtherance of that robbery, in violation of 18 U.S.C. §§ 1951 and 924(c), respectively, to account for his participation in the robbery and shooting described above (in addition to the crimes that he pled to at the time of his original plea pursuant to his cooperation agreement).  They both waived the statute of limitations (five years, in each case) so that the charges could be filed against them, and both men allocuted to the robbery and shooting at the time of their respective pleas.  Vega also testified about the incident (in very general terms – without reference to the specific location or any other telling details) as part of his criminal background testimony at the trial of Sean Carr in August 2003, and in May 2009 at the trial of Jason Camacho in United States v. Jason Camacho, 06 Cr. 129 (RJH).  Both Rodriguez and Vega have been sentenced for their crimes, have served their time, and have relocated away from the New York City area.

7.      In late May of this year, a letter was received by our Office, addressed to AUSA-2, who is no longer employed by this Office.  The letter was from Eric Glisson, an inmate at the New York state prison in Ossining.  Because I am the investigator in the Office with primary responsibility for homicide cases, the letter was routed to me.  The letter began by stating

5

that Glisson believed that our Office should investigate the murder of a cabdriver in 1995 in

Soundview, which Glisson claimed to have heard was committed by members of SMM, and

Glisson named a few individuals known to me as SMM members.  I immediately recognized

Glisson's general description of the crime as matching the robbery and shooting to which Vega

and Rodriguez had confessed.  At the end of the letter, Glisson asked for our help and stated that

he had been in jail for seventeen years for a crime he did not commit.  The receipt of this letter

was the first indication that I, or anyone at this Office to my knowledge, had that anyone other

than Vega and Rodriguez was incarcerated for this incident.  Using law enforcement databases, I

accessed Glisson's criminal history records and incarceration records, and from those records

was able to work backward to the initial police report on the January 1995 shooting death of

Baithe Diop, for which Glisson had been convicted at trial in 1997.  I notified my immediate

supervisor, AUSA Margaret Garnett, Chief of Violent Crimes, and made arrangements to visit

Glisson at Ossining.

        8.      Before visiting Glisson, I spoke by telephone separately to Vega and

Rodriguez.  Each of them confirmed the details of the robbery and shooting that they had

participated in, as set forth above.  In addition, Vega told me that he recalled that they had taken

the cabdriver's cellular telephone when they fled the cab, and that Vega had called a few friends

shortly afterward and then disposed of the phone.  Both Vega and Rodriguez stated that they did

not know that anyone had ever been charged or incarcerated for anything related to their robbery;

both expressed a willingness to assist in exonerating anyone so charged.  Both men stated that,

prior to their federal arrests, they had known Eric Glisson (whom they knew as "E-Gliss")

slightly from the neighborhood; Glisson was a year or two older than Vega and Rodriguez, so

6

they knew of him but did not associate directly with him.  Both men affirmed that Glisson had no

involvement whatsoever in the robbery and shooting that they had committed together.

        9.     I visited Glisson at Ossining on Friday, June 15, 2012.  After meeting with

him and hearing what Glisson recalled about the evidence presented at his trial in 1997, I was

more convinced that the murder that he was convicted of – that of Baithe Diop – was the same

incident confessed to by Vega and Rodriguez.  I also spoke to Glisson's attorney, Peter Cross,

Esq., that day, and informed AUSA Garnett about the substance of the visit.

        10.    On Monday, June 18, 2012, AUSA Garnett and I called Edward Talty, the

Chief of Homicide at the Bronx District Attorney's Office.  We informed him that it appeared

likely that Glisson had been convicted of a murder in which he had no involvement, and that the

actual perpetrators of the murder of Baithe Diop were Vega and Rodriguez.  Mr. Talty told us

that the Assistant District Attorney who prosecuted the Diop case, Daniel McCarthy, passed

away recently, and Mr. Talty asked for time to gather the files and look into the case further.

AUSA Garnett and I also notified Mr. Cross that we had contacted the District Attorney's Office

to discuss Glisson's case.  On Wednesday, June 27, 2012, I was informed by AUSA Garnett that

Mr. Talty had called her and stated that he was ready to meet with us about the Diop homicide.

We agreed to meet the following day, Thursday, June 28.  AUSA Garnett and I went to the Bronx

District Attorney's Office for the meeting; present were Mr. Talty, Lt. Sean O'Toole of the

NYPD's Bronx Homicide unit, and Detective Carlos Infante from Bronx Homicide.  At that

meeting, AUSA Garnett and I learned for the first time that an individual named Cathy Watkins

had also been convicted of the Diop homicide, at trial with Eric Glisson.  We told Mr. Talty and

Lt. O'Toole what Vega and Rodriguez had told us, both in 2003 and more recently.  We were

informed by Mr. Talty that the files related specifically to Eric Glisson had not yet been located, but that they would continue looking into it.

        11.     Following this meeting, AUSA Garnett and I informed Mr. Cross that the meeting had occurred and that the DA's Office was continuing to look into the matter.  AUSA Garnett was contacted by other defense counsel and, in the ensuing several days, we learned that six individuals had been charged with the Diop homicide and tried in two trials: (i) Devon Ayers, Michael Cosme, Carlos Perez, and Israel Vasquez had been tried together for the Diop homicide and the homicide of a woman named Denise Raymond; Ayers, Cosme and Perez were convicted of both homicides; and (ii) Eric Glisson and Cathy Watkins were tried together for the Diop homicide and both were convicted.  Various defense counsel provided us with the entire transcript of the Glisson-Watkins trial and with the DD-5s from the Diop homicide investigation. I, along with AUSA Garnett, reviewed all of these materials.

        12.     On July 17, 2012, AUSA Garnett and I spoke together by telephone to Vega.  Vega again reviewed the events related to the cabdriver robbery: in the winter of 1994 or 1995, he and Rodriguez had gone to a housing project in Manhattan to visit a girl that Rodriguez knew.  Rodriguez and this girl had argued during the visit, and Vega and Rodriguez left her apartment. They got into a livery cab on the street, driven by a dark-skinned man who appeared to Vega to be African.  Vega stated that the driver was reluctant to take him and Rodriguez to the Bronx, so they offered to pay him the fare upfront.  On the way to the Bronx, they decided to rob the driver and directed him to the block of Croes Avenue opposite PS 107.  After Vega and Rodriguez announced the robbery, the driver argued with them and began screaming, shouting things like "don't rob me" and "please don't shoot me".  In the course of the argument, Rodriguez's gun went off, shooting the driver, and then Vega, in reaction, fired his gun at the

driver as well.  Vega was sitting behind the driver and Rodriguez behind the front passenger seat

when the robbery occurred.  After the shooting, both men jumped out of the cab, which was still

moving forward slowly up Croes Avenue towards Lafayette.  Vega saw the cab crash into a trash

dumpster and come to a stop.  He and Rodriguez ran away from the scene, back to the nearby

housing project.  Vega took the driver's cellphone and made a few calls shortly after the robbery;

he then discarded the phone.  Vega confirmed that he does not know Cathy Watkins, and that

neither she nor Eric Glisson had any involvement whatsoever in the events of that night.[1]    Vega

also confirmed that he had not spoken recently with anyone other than me about this incident.

    13.    On July 20, 2012, AUSA Garnett and I spoke together by telephone with

Rodriguez.  Rodriguez again reviewed the events related to the cabdriver robbery: in the winter

of 1994 or 1995, he and Vega had gone to Manhattan to see a girl that Rodriguez knew.

Rodriguez recalled that this girl lived in an apartment with her mother in a housing project in

northern Manhattan, which he believed was in the vicinity of 131st or 132nd Street.  Rodriguez

recalled the girl's first name (which was an unusual first name), but did not recall her last name.

Before he and Vega left, Rodriguez asked the girl to call a cab for them, and the cab was waiting

downstairs when they left.  The driver was a black man, whom Rodriguez believed was African.

On the way home to the Bronx, he and Vega discussed robbing the cabdriver and decided to do

it.  Vega was sitting directly behind the driver and Rodriguez directly behind the passenger side.

Both men had guns.  When the driver turned onto the block of Croes Avenue where PS 107 is

located, they announced the robbery.  In the course of an argument and struggle with the driver,

---

[1] Vega also subsequently confirmed to me that Devon Ayers, Michael Cosme, Carlos Perez,
and Israel Vasquez likewise had no involvement in the events of that night.  Vega does not
believe he knows any of these individuals.

9

Rodriguez fired his gun and believes he hit the driver in the side. Vega then fired his gun and Rodriguez believed this shot hit the driver from the back, possibly up near his neck. The car was still moving up Croes Avenue towards Lafayette when he and Vega jumped out of the car, and the car then crashed into either a garbage can or possibly another car as he and Vega were running away from the scene. Rodriguez confirmed that he does not know Cathy Watkins, and that neither she nor Eric Glisson had any involvement in the events of that night.[2]   Rodriguez also confirmed that he has not spoken recently with anyone other than me about this incident.

14.     Through public records searches, I have been able to identify a woman with the same unusual first name recalled by Rodriguez, living at 30 W. 141st Street in the mid-1990s, approximately the same age as Rodriguez and Vega. I know that 30 W. 141st Street is a public housing apartment building, and is the address where Baithe Diop picked up his last fare on the night of his death. (See Glisson-Watkins Trial Transcript ("Tr.") at 683-86 (Testimony of Nicole Carter)). I also know that, at the time of the Diop homicide, Rodriguez was living at 551 Rosedale Avenue in the Soundview section of the Bronx; at that time, Vega was also living temporarily with Rodriguez at that address. 551 Rosedale is between Randall and Lacombe Avenues. At the Glisson-Watkins trial, the cab dispatcher testified that the woman who called for the cab stated that the destination was Rosedale Avenue in the Bronx; when the dispatcher asked for a cross street, the woman spoke to a male voice in the background who said "Randall," and then the woman told the dispatcher that the destination was Rosedale and Randall Avenue.

_____

[2] Rodriguez also subsequently confirmed to me that Devon Ayers, Michael Cosme, Carlos Perez, and Israel Vasquez likewise had no involvement in the events of that night. Rodriguez does not believe he knows any of these individuals, although he could not be sure.

(Tr. 683; *cf.* Tr. 808-811 (Testimony of Det. Donnelly, giving home addresses for the charged defendants)).

15.     I am familiar with the circumstances of Rodriguez's incarceration and his relocation away from the New York City area.  I do not believe it would have been possible for Vega, Glisson, or anyone else connected to this case to have contacted Rodriguez since shortly after his arrest in 1997.

16.     Based on my years of training and experience investigating homicides and other violent crimes, my familiarity with the accounts of Vega and Rodriguez, and my review of the transcript and investigative materials from the Glisson-Watkins trial, I believe the evidence is overwhelming that Vega and Rodriguez, acting alone, robbed and shot Baithe Diop on January 19, 1995, causing his death.  Every undisputed fact regarding the Diop homicide corresponds to and corroborates the account given by Vega and Rodriguez (at a time and under circumstances where they had no incentive to falsely incriminate themselves, or falsely exonerate others): (a) the general time frame; (b) the African driver; (c) the location of the pickup and original drop-off request, and the female caller to arrange the car (*see* ¶ 14, above); (d) the exact location of the robbery and shooting (*see, e.g.,* Tr. 36-80 (Testimony of Firefighter Brennan); 102-171 (Testimony of P.O. Crisalli)); (e) the ballistics, crime scene and medical examiner evidence, indicating two shooters, firing at relatively close range with one shot each, one from the right side of the driver and one from behind the driver to the right (*see* Tr. 282-86 (Testimony of Det. Harris); 619-640 (Testimony of Dr. Josette Montas); 1013-34 (Testimony of Det. Tota); (f) the shouts of the driver prior to the shooting (*see* Tr. 196-217 (Testimony of Johnetta Lyons); (g) the slow-moving vehicle heading towards Lafayette Avenue before swiping a parked car and then crashing into a trash dumpster on the sidewalk (confirmed by both the crime scene evidence (Tr.

11

220-307 (Testimony of Det. Harris)) and the testimony of Johnetta Lyons); and (h) the driver's

stolen cellphone (with phone records showing calls to associates of Vega and Rodriguez,

including a Luis Rodriguez with the same address (551 Rosedale Avenue) where Jose Rodriguez

lived in January 1995) (see Tr. 1002 (Testimony of Det. Donnelly)).

17.     The only trial testimony inconsistent with the guilt of Vega and Rodriguez

is (i) the testimony of Miriam Tavarez, a witness with an obvious bias, who told materially

different stories on different occasions, whose testimony was inconsistent with the physical

evidence, and who gave what I believe, based on my experience and my familiarity with the

location of the homicide, to be highly questionable testimony about her ability to perceive the

events of that night and what she actually did see, if anything; and (ii) a lay-witness voice

identification of Cathy Watkins by the dispatcher from Diop's employer, who was presented with

a single voice exemplar.

18.     AUSA Garnett informed Mr. Talty about the conclusions set forth above

on Wednesday, July 18; discussed the matter further with Mr. Talty on Thursday, July 19; and

discussed these same conclusions with counsel to Watkins and Glisson on Friday, July 20.

I declare under penalty of perjury that the foregoing is true and correct, to the best
of my knowledge.

Dated: New York, New York
       July 30, 2012

JOHN O'MALLEY, Investigator
United States Attorney's Office
Southern District of New York
Telephone:  (212) 637-2200

sworn to before me

Michael D. Maimin
Notary Public - State of New York
No. 02MA6088084
Quialified in New York County
Commission Expires June 30, 2015

12

# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY CRIMINAL DIVISION: PART M80
--------------------------------------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,

-against-                                                 Indictment No.
                                                            1086/95
                                                    1. Motion to vacate
                                                    Conviction
                                                       CPL Sec 440.10
                                                    2. Motion for Discovery
                                                       C.P.L Sec. 440.30(1)(b)

ERIC GLISSON and CATHY WATKINS,         FILED
                                        Defendants.
--------------------------------------------------------------------  SEP 2 6 2012

                                        SUPREME COURT CLERK'S OFFICE
ALVARADO, J.:                                   BRONX COUNTY

        Upon the foregoing papers these motions are decided as follows:

                        MOTIONS TO VACATE CONVICTIONS

        The defendants' motions pursuant to C.P.L § 440.10 to vacate their convictions

based upon the discovery of new evidence and actual innocence in the above-

enumerated matter are, at this time, held in abeyance pending further proceedings as

outlined below.

        The history of this case is well documented by the moving papers submitted by

counsel for the clients and in the response submitted by the People.

        In brief, defendants were convicted in October of 1997 of Murder in the Second

Degree for what is most easily described as the robbery/execution of cabdriver Braithe

Diop. Each was sentenced to an indeterminate term of incarceration of 25 years to life.

Each conviction has been affirmed through the appellate process and sustained

through post judgement applications made pursuant to C.P.L. 440.10.

According to both sides, the Office of the United States Attorney for the Southern District of New York, pursuant to information developed by Investigator John O'Malley of that office, has received statements from Gilbert Vega and Jose Rodriguez indicating that they, as members of a criminal enterprise known as "Sex, Money, Murder, were the actual perpetrators of the crime in question. This information was made available to the Office of the Bronx District Attorney and, it would appear, to defense counsel , at least in a preliminary fashion, in mid to late June of 2012. Defendant's motions were filed on August 10, 2012.

In their response filed on September 12, 2012, the Office of the District Attorney states that for a variety of reasons which includes the deaths of critical parties and the status of Mr. Vega and Mr. Rodriguez as "protected cooperators," the office is left "...without means to independently confirm" the information provided. Because of this, the "...Office remains unable to concede the factual allegations critical to defendant's motions to vacate." [1]

As is pointed out by the People, the relevant statute outlines the courses of action available to the Court in this situation.  Pursuant to C.P.L. 440.30(3), a motion to vacate a conviction must be granted without a hearing if it alleges a ground, supported by sworn facts constituting a legal basis for the motion and such ground is either conceded by the People to be true or is substantiated by unquestionable documentary proof. The People do not concede the truth of the allegations raised by the defendants and the proof contained within the moving papers does not rise to the level specified by

[1] See People's affirmation in response dated September 12, 2012, page 5, paragraph seven.

this section[2]. Thus, this motion cannot be summarily granted.

Conversely, pursuant to C.P.L. 440.30 (4), a motion may be denied without a hearing if it does not allege a ground constituting a legal basis for the motion or if the facts alleged in support of the motion are unsworn, conclusively refuted, contradicted by a court record or other document, unsupported by other evidence or there just is no reasonable possibility under all the other circumstances that it is true. Clearly, the proof submitted thus far by the defendants raises a serious question as to the guilt. This question merits further examination by the Court.

C.P.L. 440.30 (5) provides that if the court is unable to resolve a motion based solely on the submissions, i.e. pursuant to any of the subdivisions of C.P.L. 440.10, then in accordance with the requirements of C.P.L. 440.30 (3) and (4) a hearing must be ordered.

Since it is clear that this motion cannot be resolved based solely on the submissions, a hearing is ordered, pursuant to C.P.L. § 440.30(5), so that the Court may make findings of fact essential to the motion's determination.

## MOTIONS FOR DISCOVERY

Concurrent with the filing of the motions to vacate the convictions, defendants have filed a motion seeking discovery of the latent prints recovered from the victim's motor vehicle by the New York City Police Department. Defendants also seek an un-redacted copy of the record of calls made from the victim's cell phone from January 19, 1995 through January 25, 1995 along with identifying information and home addresses

---

[2] The Court has very carefully reviewed the exhibits submitted with the motions. These exhibits are compelling but do not enable the Court to reach the conclusion that the motion can or should be granted without an evidentiary hearing.

of the recipients of those phone calls. In the People's response dated September 12, 2012, the People consent, in the event a hearing is ordered, to "...discovery of those items listed in the motions that are in the possession of this office, subject to a protective order..." pursuant to C.P.L. 440.30(1)(b).[3]

## CONCLUSION

With respect to the motions to set aside the convictions, final decision is reserved pending the outcome of a hearing which is granted, pursuant to C.P.L. § 440.30(5), so that the Court may make findings of fact essential to the motion's determination.

With respect to the motions for discovery, upon the consent of the People, those are granted subject to the limitations discussed above.

The parties are directed to make all necessary arrangements to conduct the hearing and the People are directed to provide those materials within their possession subject to a Protective Order, if needed.

This shall constitute the decision and order of the Court.

Dated:

Bronx, New York

September 25, 2012

E. Albarado

Efrain Alvarado, A.J.S.C.

---

[3] See People's affirmation in response dated September 12, 2012, pages 5-6.

EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

THE PEOPLE OF NEW YORK,

     -against-

ERIC GLISSON,

          Defendant.

Indictment No. 1086/95

CONSENT ORDER
VACATING CONVICTION

WHEREAS, this matter was commenced by the service and filing of a motion by Defendant, Eric Glisson under CPL §440.10(1)(g) for an Order vacating his judgment of conviction and granting him a new trial based on newly discovered evidence, in the interest of justice and for good cause shown;

WHEREAS, The People of the State of New York, having duly considered the papers and evidence submitted in support of the motion, including the Affidavit of John O'Malley, an Investigator in the Office of the United States Attorney for the Southern District of New York and formerly a New York City Police Department Detective assigned to Bronx Homicide, sworn to July 30, 2012, have consented to the granting of the motion subject to the terms and conditions set forth below;

WHEREAS, on October 19, 2012 the Defendant, Eric Glisson, appeared before this Court represented by his counsel, and this Court being satisfied that the Defendant understands the terms and conditions of this Order and of his release from custody and has freely, knowingly and voluntarily agreed to the terms hereof and to the Memorandum of Agreement attached hereto;

NOW, THEREFORE upon the application of Defendant, Eric Glisson, by his counsel and with the consent of The People of the State of New York and upon the Court's due consideration of the evidence presented in support of the motion, and for good cause shown, it is hereby

ORDERED that the October 28, 1997 conviction of Eric Glisson in the Supreme Court, Bronx County on two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25 [1] and [3]) is hereby vacated pursuant to CPL §440.10(1)(g). However, pursuant to CPL §440.10(4) the indictment upon which the charges were based is hereby continued subject to the following terms and conditions:

1.      Within ninety (90) days of the date of this Order The People of the State of New York (the "People")  may move this Court for an order reinstating the conviction and in such event this Court shall conduct a hearing on the evidence as provided in the decision of the Court, per the Hon. Efran Alvarado, entered September 26, 2012 ordering a hearing on Defendant, Eric Glisson's motion to vacate his conviction and dismiss the indictment.

2.      If the People do not move within the time period provided in Paragraph 1 above, or if within such period the People notify this Court in writing that the People consent to the lifting of the conditions set forth herein, this order vacating the conviction shall become the final order of this Court and the indictment shall be dismissed forthwith without further order of this Court.

3.      The Defendant, Eric Glisson, shall be released from prison forthwith provided that for the ninety (90) day period provided in Paragraph 1 above he shall wear an electronic monitoring bracelet to be provided by the People for that purpose and he shall abide by the conditions set forth in the attached agreement.

4.      If the People move within ninety (90) days hereof to reinstate the conviction of

Eric Glisson, the conditions set forth in Paragraph 3 above shall remain in force until the matter

is resolved by this Court unless the Court, for good cause shown, enters a further order.  If the

People do not so move within ninety (90) days hereof, or if the People sooner notify the Court

that the conditions set forth above should be removed, the electronic monitoring bracelet shall be

removed from the Defendant forthwith without further order of this Court.


ENTERED:


_____
HON. DENIS J. BOYLE, J.S.C.

Consented and Agreed this ___ day of October 2012 by:

The People of the State
 of New York; Robert T. Johnson, D.A.


By: _____


Eric Glisson, Defendant

By: _____
        Peter A. Cross, Esq.
        Attorney for Defendant


_____
ERIC GLISSON

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

THE PEOPLE OF NEW YORK,

       -against-

ERIC GLISSON,

           Defendant.

Indictment No. 1086/95

CONSENT ORDER
VACATING CONVICTION

      WHEREAS, this matter was commenced by the service and filing of a motion by Defendant, ERIC GLISSON under CPL §440.10(1)(g) for an Order vacating his judgment of conviction and granting him a new trial based on newly discovered evidence, in the interest of justice and for good cause shown;

      WHEREAS, The People of the State of New York, having duly considered the papers and evidence submitted in support of the motion, have consented to the granting of the motion;

      NOW, THEREFORE upon the application of the People of the State of New York and upon due consideration of the evidence presented in support of the motion, and for good cause shown, it is hereby

      ORDERED that the October 28, 1997 conviction of ERIC GLISSON in the Supreme Court, Bronx County on two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25[1] and [3]) is hereby vacated pursuant to CPL §440.10(1)(g), and the indictment upon which the charges were based is hereby dismissed pursuant to CPL §440.10(4); and it is

      FURTHER ORDERED that the October 24, 2012 Order of this Court is hereby vacated in its entirety and the electronic monitoring bracelet placed on ERIC GLISSON shall be removed forthwith.

ENTERED: *D/B*

HON. DENIS J. BOYLE

*December 13, 2012*